## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:                                                        CHAPTER 7

RICK MYERS                                        CASE NO. 00-53489EE
TINA MYERS
D/B/A P & L PROPERTIES
D/B/A EXPRESS PERSONNEL


KIMBERLY R. LENTZ, TRUSTEE

VS.                                              ADVERSARY NO. 10-05014EE

RICK MYERS AND TINA MYERS,
D/B/A EXPRESS PERSONNEL,
D/B/A P & L PROPERTIES,
INFINITY SERVICES OF MISSISSIPPI, INC.,[1]
LIBERTY MUTUAL INSURANCE COMPANY,
FOX EVERETT UNDERWRITERS, LTD. AND
STEVE LEE


Hon. Derek A. Henderson                          Attorneys for Debtors
1765-A Lelia Drive Suite 103
Jackson, MS  39216

Hon. Robert Gambrell
101 Ricky D. Britt Blvd., Suite 3
Oxford, MS 38655

Hon. David Baria
544 Main Street
Bay St. Louis, MS 39520

---

[1]In their pleadings, the parties sometimes use the name Infinity Services of Mississippi, Inc. However, according to the records of the Mississippi Secretary of State's office, the correct legal name is Infinity Services of Mississippi, LLC.

Hon. Michael T. Jaques
240 Trace Colony Park Drive
Ridgeland, MS  39157

Hon. Kimberly R. Lentz                                    Chapter 7 Trustee
2012 23rd Avenue
Gulfport,  MS 39501

Hon. William J. Little, Jr.                         Attorney for Chapter 7 Trustee
Post Office Box 927
Gulfport,  MS 39502


Hon. Robert Alan Byrd                    Attorneys for Liberty Mutual Insurance Co.
Post Office Box 1939
Biloxi, MS  39533

Hon. Clifford K. (Ford) Bailey, III
Hon. Kelly D. Simpkins
300 Concourse Boulevard, Suite 200
Ridgeland, MS  39157


Hon. Edward J. Currie, Jr.                    Attorneys for Fox-Everett Underwriters, LTD.
Post Office Box 750                                               and Steve Lee
Jackson, MS  39205-0750

Hon. Thomas E. Schwab
1515 Poydras Street, Suite 2350
New Orleans, LA  70112


Edward Ellington, Chief Judge


## MEMORANDUM OPINION ON THE
### *COMPLAINT FOR DECLARATORY JUDGMENT*

**THIS MATTER** came before the Court on November 29-30, 2011, for trial on the

following pleadings filed in the above-styled adversary proceeding:

    1. *Complaint for Declaratory Judgment* (#1) filed by the Chapter 7 Trustee, Kimberly R.

Lentz;

2. *Joint Answer and Cross-Claim of Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd. and Steve Lee to Trustee's Complaint for Declaratory Judgment* (#6);

3. *Defendants Rick Myers and Tina Myers d/b/a Express Personnel, d/b/a P & L Properties ("Debtors") Motion to Dismiss, Motion to Dismiss Parties, Answer, and Affirmative Defenses* (#7);

4. *Defendant Infinity Services of Mississippi, Inc. Motion to Dismiss, Motion to Dismiss Parties, Answer, and Affirmative Defenses* (#9);

5. *Plaintiff's Response to Defendants' Answer and Motion to Dismiss* (of Rick Myers and Tina Myers) (#12) filed by the Chapter 7 Trustee, Kimberly R. Lentz;

6. *Plaintiff's Response to Defendants' Answer and Motion to Dismiss* (of Infinity Services of Mississippi, Inc.) (#13) filed by the Chapter 7 Trustee, Kimberly R. Lentz;

7. *Defendant Rick and Tina Myers dba Express Personnel dba P & L Properties Answer and Affirmative Defenses to Cross-Claim of Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd. and Steve Lee* (#52); and

8. *Defendant Infinity Services of Mississippi, LLC's Answer and Affirmative Defenses to Cross-Claim of Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd. and Steve Lee* (#53).

After considering all pleadings, the exhibits and testimony from the trial and the briefs filed by the parties, the Court finds that the Debtors, Rick and Tina Myers, converted their Chapter 13 case to a Chapter 7 case in bad faith, and, therefore, all property held by the Debtors as of the date of conversion is property of their bankruptcy estate. The Court further finds that estate assets and/or proceeds were used to create Infinity Services of Mississippi, LLC, and is itself property of the

Debtors' bankruptcy estate.

**FACTS**[2]

The following recitation of facts is from the *In re Myers*[3] opinion this Court entered in the

Myers' bankruptcy case in which the Court denied motions to settle.  While all of the facts are not

pertinent to the issues currently before the Court, it details what has occurred in the main bankruptcy

case (No. 00-53489EE) and in two other adversary proceedings (Adv. No. 06-05064EE and 07-

05011EE).  The facts quoted below begin with the commencement of the bankruptcy case and end

at the conclusion of the trial on the then pending settlement offers.  In the conclusions of law section,

the Court will supply additional findings of fact regarding the transfer of assets and the formation

of Infinity Services of Mississippi, LLC.

> The matter currently before the Court is one in a long line of matters litigated between Rick and Tina Myers (Debtors), Liberty Mutual Insurance Company, Fox-Everett Underwriters, LTD., Steve Lee and the Chapter 7 Trustee, Kimberly R. Lentz (Trustee).  In order to put the issues before the Court in context, it is necessary to give a rather detailed background of what has occurred between the parties up to this time.
>
> On August 17, 2000, the Debtors filed a petition under Chapter 13 case of the United States Bankruptcy Code styled *Rick and Tina Myers dba P & L Properties dba Express Personnel* in the Gulfport Divisional Office of the Southern District of Mississippi.  The case was assigned to the Honorable Edward R. Gaines.  P & L Properties (P&L) was a limited liability corporation wholly owned by Rick Myers. P&L provided temporary employees to businesses and operated through a franchise with Express Services, Inc.  On March 2, 2001, the Debtors converted their case to one under Chapter 7 of the United States Bankruptcy Code.

---

[2]Pursuant to Federal Rule of Bankruptcy Procedure 7052, this opinion constitutes the Court's findings of fact and conclusions of law.  The matter before the Court is very fact intensive.  To the extent any of the Court's findings of fact are construed to be conclusions of law, they are adopted and deemed conclusions of law.  Likewise, to the extent any of the conclusions of law are construed to be findings of fact, they are adopted and deemed findings of fact.  *Brandt v. Trivest II, Inc. (In re Plassein Intern. Corp.),* 405 B.R. 402, 405 n. 1 (Bankr. D. Del. 2009).

[3]*In re Myers,* 425 B.R. 296 (Bankr. S.D. Miss. 2010).

4

On October 25, 2001, an *Order Approving Trustee's Report of No Distribution* was entered in which the Chapter 7 Trustee, C. Thomas Anderson, certified that there were no assets to administer for the benefit of the creditors of the estate.[4] The Debtors received their *Discharge of Debtor* also on October 25, 2001, and their case was closed on October 29, 2001.

On October 21, 2002, the Debtor, Rick Myers, and Infinity Services of Mississippi, LLC (collectively, Myers) filed a complaint against Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd., and Steve Lee (collectively, Liberty Mutual) in the Circuit Court of the First Judicial District of Hinds County, Mississippi (State Court Litigation). Infinity Services of Mississippi (Infinity) was a limited liability company established by Rick Myers on or around March 30, 2001. Infinity was a labor subcontracting company which supplied skilled labor to industrial and marine contractors both inside and outside of Mississippi. In the lawsuit, Myers basically contends that Liberty Mutual failed to procure and to provide Infinity with workers' compensation insurance coverage and that Myers relied upon false representations made by Steve Lee and Fox-Everett during the solicitation and sale of the policy for workers' compensation insurance. As a result of the actions of Liberty Mutual, Myers alleges that Infinity eventually went out of business. Myers asserts various causes of action, including breach of contract, gross negligence, breach of duty of good faith and fair dealing, and emotional distress along with several other counts.

On May 25, 2004, Liberty Mutual removed the State Court Litigation to the United States District Court for the Southern District of Mississippi[5] alleging that the causes of action were property of the Myers' bankruptcy estate (District Court Action). In support of its contention that the District Court Action is property of the Debtors' bankruptcy estate, Liberty Mutual asserts that in late 2000, Myers requested that Steve Lee, an agent for Fox-Everett, assist him in procuring a workers' compensation policy to cover workers subject to the U. S. Longshore & Harbor Workers' Compensation Act (USL&H).[6] Mr. Lee obtained coverage for Myers through the Mississippi Workers' Compensation Assigned Risk Plan. The assigned risk plan was administered by Compensation Insurance Services (CIS). Once CIS approved P&L's application, it assigned Liberty Mutual Insurance Company as the plan's servicing carrier for the policy.

---

[4]C. Thomas Anderson was appointed the Chapter 7 Trustee in 2001 when the Debtors converted their case from a Chapter 13 case to a Chapter 7. When the case was reopened in 2004, Kimberly R. Lentz was appointed the Chapter 7 Trustee.

[5]The case was assigned Civil Action No. 3:04-cv-392-HTW-LRA.

[6]33 U.S.C. § 901, et. seq.

According to Liberty Mutual, as the servicing carrier, Liberty Mutual "issued and administered the policy and any claims arising thereunder in accordance with the guidelines of the plan and the National Council on Compensation Insurance ("NCCI"). . . .Liberty subsequently issued its policy. . .to P&L for the policy period of 12/16/00-12/16/01. . . .Mississippi was the only state listed in the USL&H endorsement."[7]

Liberty Mutual alleges that in January of 2001, Myers began "surreptitiously transferring P&L's cash, accounts receivable, business contacts and other assets to Infinity Services and thereby depriving his creditors of the only realistic chance they had of recovering at least some portion of their claims against Myers *(sic)* bankruptcy estate. . . .In the midst of these transactions, on March 2, 2001, he converted his bankruptcy to a Chapter 7." *Id.* at p. 4. In light of the actions of Myers, Liberty Mutual asserts that the Debtors' conversion to a Chapter 7 was in bad faith, that Infinity is a successor in interest of P&L, and therefore, the District Court Action is property of the Debtors' bankruptcy estate.

The Debtors filed a motion to reopen their Chapter 7 bankruptcy case on September 23, 2004. On October 1, 2004, an order was entered reopening their case. Kimberly R. Lentz was appointed the Chapter 7 Trustee.

On March 22, 2005, Judge Henry T. Wingate entered an order in the District Court Action denying Myers' motion to remand. In denying the motion to remand, Judge Wingate addressed the issue of whether the lawsuit was property of the Debtors' bankruptcy estate. Judge Wingate stated that "this court is convinced at this stage that defendants have produced enough proof to show that Myers' claims in the lawsuit *sub judice* arose prior to and during Myers' bankruptcy proceedings."[8] Based on the same reasoning, Judge Wingate also denied Myers' motion to abstain on March 24, 2005.

The District Court Action remains pending before Judge Wingate; however, on October 6, 2005, all discovery was stayed in the District Court Action pending resolution in this Court of the issue of whether the cause of action is property of the Debtors' bankruptcy estate.

Liberty Mutual has filed two proof of claims in the Debtors' bankruptcy case. On May 2, 2005, Liberty Mutual filed a claim in the amount of $977,753.46 (claim #1).

---

[7] *Joint Memorandum of Defendants Liberty Mutual Insurance Company, Fox-Everett Underwriters, LTD. and Steve Lee in Opposition to Trustee's Motion to Compromise and in Support of Defendants' Alternative Proposal*, p. 3 (October 21, 2009).

[8] Wingate, J. *Infinity Services of Miss., LLC and Ricky Myers vs. Liberty Mutual, et. al.,* Case No. 3:04-cv-392-HTW-LRA, *Order [Denying Remand* (#54)], p. 6, March 21, 2005.

The stated basis for this claim is "assigned risk premium." On April 23, 2007, Liberty filed a second proof of claim in the amount of $977,798.46 (claim #24). The stated basis for this claim is "money loaned."

At some point after the bankruptcy case was reopened, the Trustee reached an agreement with Liberty Mutual to settle the District Court Action. On May 4, 2005, the Trustee filed *Trustee's Motion for Authority to Compromise* (Liberty Mutual Settlement). The Liberty Mutual Settlement entailed Liberty Mutual paying the Trustee $60,000 in exchange for the Trustee dismissing the District Court Action. However, this settlement was contingent upon a finding that the Debtors converted their Chapter 13 case in bad faith. The Debtors objected to this settlement.[9]

Subsequently on August 25, 2006, the Trustee filed an adversary proceeding (Trustee's Adversary Proceeding) [Adv. No. 06-05064EE] against the Debtors.[10] The complaint contains two counts. In Count I, the Trustee prayed for a monetary judgment against the Debtors for the $20,000 the Debtors received shortly after the conversion of their case to a Chapter 7 for the sale of a franchise agreement. The Trustee alleged that on *Schedule B - Personal Property*, the Debtors listed the value of P&L and the franchise of Express Personnel Services as zero. However, less than two weeks after the Debtors converted their case to a Chapter 7, the Debtors received $20,000 for the sale of the Express Services franchise back to Express Services. In Count II the Trustee alleged that Infinity was a mere continuation of the business of P&L...Infinity had the exact same employees, same address and phone numbers and the same insurance coverage as P&L. The Trustee sought a declaratory judgment that Infinity was the successor in interest of P&L, and therefore, all of the assets of Infinity were property of the Debtors' bankruptcy estate.

[Additional background information: The second adversary proceeding filed in this case was filed on March 20, 2007, by Liberty Mutual (Adversary No. 07-05011EE). In this adversary proceeding, Liberty Mutual alleges that the Debtors are indebted to Liberty Mutual for unpaid workers' compensation premiums totaling approximately $977,798.46. Liberty Mutual asserts that this debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[11] This adversary is still pending.]

On May 30, 2007, Judge Gaines recused himself from hearing the Trustee's

---

[9]As noted later in the *Finding of Facts*, the Liberty Mutual Settlement was withdrawn by an *Agreed Order* on September 11, 2009.

[10]Styled: *Kimberly R. Lentz, Trustee for the Bankruptcy Estate of Rick Myers and Tina Myers d/b/a P & L Properties d/b/a Express Personnel v. Rick and Tina Myers;* Adversary No. 06-5064.

[11]Hereinafter, all code sections refer to the Bankruptcy Code found at Title 11 of the United States Code unless specifically noted otherwise.

Adversary. Thereafter, the Trustee's Adversary Proceeding was transferred to the Jackson Divisional Office of the Southern District of Mississippi. The Trustee's Adversary Proceeding was assigned to the undersigned judge.

The Trustee and the Debtors agreed to settle the Trustee's Adversary Proceeding, and on August 22, 2007, the Trustee filed *Motion to Approve Compromise* (Debtors' Adversary Settlement). In the Debtors' Adversary Settlement, the basic terms are that the Debtors agreed to pay the Trustee a sum of $20,000 and that the Trustee agreed to dismiss Count I and II of the adversary proceeding and to withdraw the Liberty Mutual Settlement. Liberty Mutual objected to the Debtors' Adversary Settlement and stated that it was willing to purchase from the Trustee the causes of action against the Debtors.

The Debtors' Adversary Settlement was cross-indexed from the adversary and into the Debtors' bankruptcy file. On October 29, 2007, Judge Gaines also recused himself from hearing the matters in the main bankruptcy case. The main bankruptcy case was assigned to the undersigned judge. At that point, the Debtors' main bankruptcy case and related adversary proceedings were all pending before this Court.

On March 17, 2008, a *Consent Judgment*[12] was entered in the Trustee's Adversary Proceeding in which the Trustee agreed to dismiss Count I of the complaint. The judgment further held that Count II was dismissed but that no adjudication was being made as to whether Infinity Services, LLC is property of the Debtors' bankruptcy estate.[13]

The Court set January 15, 2009, as the date of the trial on the Liberty Mutual Settlement. At the pretrial conference, the parties agreed to mediation before the Honorable David W. Houston, III, United States Bankruptcy Judge for the Northern District of Mississippi. The mediation did not result in the parties reaching a global settlement of all of the pending matters. However, Myers and the Trustee reached an agreement to resolve the dispute over whether the causes of action in the District Court Action were property of the Debtors' bankruptcy estate.

> . . . .

On May 4, 2009, the *Response to Trustee's Motion to Compromise and Motion of Liberty Mutual Insurance Company and Fox-Everett Underwriters, LTD., to*

---

[12]A *Corrected Consent Judgment* was entered on October 23, 2008, to correct the docket number for the Liberty Mutual Settlement listed in the order–from #89 to #79.

[13]The Debtors' Adversary Settlement contemplated the Debtors paying the Trustee $20,000 in exchange for the settlement of the adversary. The Trustee did receive a payment from the Debtors in the amount of $20,000, however, neither *Consent Judgment* mentions the $20,000 payment.

*Compromise* (Response) was filed. . . .Liberty Mutual and Fox-Everett propose a counter-offer to the Trustee (Liberty Mutual Counter-Offer). . . .

A trial on the Myers' Settlement and the Liberty Mutual Counter-Offer was held on August 12, 2009. At the conclusion of the trial, the Court took the matter under advisement and instructed the parties to submit briefs supporting their respective positions.

On September 11, 2009, the parties entered into an *Agreed Order* in which the Trustee withdrew the Liberty Mutual Settlement. Therefore, the only settlement offers currently pending in this case is the Myers' Settlement and the Liberty Mutual Counter-Offer, both of which are the subject of this opinion.[14]

The Court did not approve either the Myers' Settlement or the Liberty Mutual Counter-Offer. The Court found that the Myers' Settlement was not fair or equitable and was not in the best interests of the bankruptcy estate. The Court found the Liberty Mutual Counter-Offer was contingent and was not in the best interests of the bankruptcy estate. In the last paragraph of its opinion, the Court stated "that it is time for the Trustee to take the appropriate action to move the case forward and to have the bad faith conversion/property of the estate issues finally determined."[15]

### Third Adversary Proceeding

Heeding the Court's instructions, the Trustee initiated the above-styled adversary proceeding on April 6, 2010, with the filing of her *Complaint for Declaratory Judgment* (#1) (Complaint). In Count I of the Complaint, the Trustee seeks an adjudication by the Court of whether the causes of action pursued by Rick Myers and Infinity Services of Mississippi, LLC against Liberty Mutual and others in the District Court Action are property of the Debtors' bankruptcy estate. In Count II of the Complaint, the Trustee seeks a determination of whether Infinity Services of Mississippi, LLC is a successor in interest to the Debtors and Express Personnel d/b/a P & L Properties. The Trustee

---

[14]*In re Myers,* 425 B.R. 296, 298-303 (Bankr. S.D. Miss. 2010).

[15]*Id.* at 309.

asserts that if Infinity Services of Mississippi, LLC is a successor in interest, then the Trustee "has control and ownership of any causes of action set forth in the [District Court Action] which are the property of Infinity Services, LLC."[16]

Liberty Mutual's Answer

On May 21, 2010, Liberty Mutual filed its *Joint Answer and Cross-Claim of Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd. and Steve Lee to Trustee's Complaint for Declaratory Judgment* (#6) (hereinafter, as to the answer only, Liberty Mutual Answer). In the Liberty Mutual Answer, Liberty Mutual asserts that this Court is bound by Judge Wingates' ruling that the underlying claims of the District Court Action accrued prior to and during the Debtors' bankruptcy proceeding. Therefore, Liberty Mutual asserts that the District Court Action is property of the bankruptcy estate.

Liberty Mutual's Cross-Claim

Liberty Mutual also asserts a cross-claim in its *Joint Answer and Cross-Claim of Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd. and Steve Lee to Trustee's Complaint for Declaratory Judgment* (#6) (hereinafter, as to the cross-claim only, Cross-Claim). In its Cross-Claim, Liberty Mutual recites the facts which it contends proves that the claims are property of the bankruptcy estate. Liberty Mutual states that the claims of the Debtor and Infinity Services of Mississippi, LLC in the District Court Action are property of the bankruptcy estate on at least three independent grounds:

> (1) the previous holding of Judge Wingate that *all* of [Myers'] claims are property of the estate if he converted to Chapter 7 in bad faith, (2) [Myers'] claims accrued prior to Myers conversion to Chapter 7 on March 2, 2001, and are property of the estate if he converted in bad faith, as provided by section 348(f)(2) of the Bankruptcy Code, and (3) Infinity is a continuation of P&L or a successor in interest, created with assets

---

[16]*Complaint for Declaratory Judgment*, Adversary No. 10-05014EE, Docket No. #1, ¶ 20.

10

of P&L that were not disclosed to the bankruptcy court and its alleged claims are property of the bankruptcy estate. . . .[17]

## Debtors' Answer

The *Defendants Rick Myers and Tina Myers d/b/a Express Personnel, d/b/a P & L Properties ("Debtors") Motion to Dismiss, Motion to Dismiss Parties, Answer, and Affirmative Defenses* (#7) and the *Defendant Infinity Services of Mississippi, Inc. Motion to Dismiss, Motion to Dismiss Parties, Answer, and Affirmative Defenses* (#9),[18] were both filed on May 26, 2010, and are substantially identical pleadings. For reasons explained shortly, the Court will refer to these pleadings as the Debtors' Answer. In the Debtors' Answer, the Debtors assert as defenses some of the same grounds which were previously ruled upon and denied in the Court's judgment dismissing the motions to dismiss. In addition, the Debtors list various defenses against the Complaint such as the doctrine of laches, denial of constitutional rights, estoppel, prohibition against double recovery, to name a few. Further, the Debtors allege that the causes of action are not property of the bankruptcy estate in any event because the assets had been abandoned from the bankruptcy estate.

## Trustee's Responses

On June 17, 2010, the Trustee filed two identical general denial responses to the Debtors' Answer: *Plaintiff's Response to Defendants' Answer and Motion to Dismiss* (of Rick Myers and

---

[17]*Joint Answer and Cross-Claim of Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd. And Steve Lee to Trustee's Complaint for Declaratory Judgment,* Adversary No. 10-05014EE, Docket No. 6, pp. 11-12.

[18]Both of these answers contain motions to dismiss. In addition, the Debtors also filed the exact same pleadings and separately docketed them as *Motions to Dismiss* (#8 and #10). The motions sought to have the adversary and/or parties dismissed under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 21 (the correct rules under the Federal Rules of Bankruptcy Procedure were not cited). As discussed later in this Opinion, on March 14, 2011, the Court entered its *Final Judgment Denying the Motions to Dismiss.* This final judgment denied all of the pending motions to dismiss on all grounds contained in the pleadings (namely, adversary docket numbers: 7, 8, 9 and 10).

Tina Myers) (#12) and *Plaintiff's Response to Defendants' Answer and Motion to Dismiss* (of Infinity Services of Mississippi, Inc.) (#13).

Debtors' Response to Cross-Claim

On November 23, 2011, *Defendant Rick and Tina Myers dba Express Personnel dba P & L Properties Answer and Affirmative Defenses to Cross-Claim of Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd. and Steve Lee* (#52); and *Defendant Infinity Services of Mississippi, LLC's Answer and Affirmative Defenses to Cross-Claim of Liberty Mutual Insurance Company, Fox-Everett Underwriters, Ltd. and Steve Lee* (#53) were filed. These responses are likewise substantially identical to each other and are also substantially verbatim to the previously filed Debtors' Answer.

Debtors' Motion to Dismiss

The Court set the motions to dismiss for hearing on March 11, 2011. After the parties presented their respective positions to the Court, the Court ruled from the bench and denied the motions to dismiss. On March 14, 2011, the Court entered a *Final Judgment Denying the Motions to Dismiss* (#29). Also on March 14, 2011, the Court entered a *Scheduling Order* (#28) on the Complaint and the various answers/responses.

Debtors' Summary Judgment Motion

On June 14, 2011, *Defendants Rick Myers and Tina Myers d/b/a Express Personnel, d/b/a P & L Properties and Infinity Services of Mississippi, Inc.'s*[19] *Motion for Summary Judgment* (#36) was filed. In their summary judgment motion, the Debtors state that they are entitled to a judgment

---

[19]Hereinafter, for purposes of this opinion, the term *Debtors* will be used to collectively refer to Rick and Tina Myers d/b/a Express Personnel d/b/a P & L Properties and the unincorporated entity of Infinity Services of Mississippi. When referring to the separate legal entity Infinity Services of Mississippi, LLC, which Rick Myers created, the Court will specifically state so.

as a matter of law as to Count I of the Complaint. The Debtors assert that the causes of action in the District Court Action belong to Infinity Services of Mississippi, LLC and Rick Myers and are not property of the bankruptcy estate because the causes of action did not accrue until Liberty Mutual denied insurance coverage in April of 2002. Since the causes of action did not exist until after the Debtors had received their discharge and their bankruptcy case was closed, the Debtors assert that the District Court Action is not property of the bankruptcy estate and that the issue of whether they converted their case in bad faith is moot.

Responses to the motion for summary judgment were filed by Liberty Mutual and the Trustee. Liberty Mutual and the Trustee both denied that the Debtors were entitled to a judgment as a matter of law as to Count I because Judge Wingate had previously adjudicated that the cause of action accrued prior to the date the Debtors converted to a Chapter 7 case.

On September 1, 2011, the Court entered its *Memorandum Opinion on the Defendants Rick Myers and Tina Myers d/b/a Express Personnel, d/b/a P & L Properties and Infinity Services of Mississippi, Inc.'s Motion for Summary Judgment* (#48). In denying the motion for summary judgment, the Court once again found that Judge Wingate clearly adjudicated in the District Court Action that the cause of action accrued prior to the Debtors' conversion to a Chapter 7. Judge Wingate held: "Accordingly, this court finds that the cause of action is core since: (1) **the cause of action accrued prior to the conversion**, (2) it is property of the bankruptcy estate if the conversion was fraudulent, and (3) it effects the liquidation of the assets of the bankruptcy estate."[20]

<u>Trial of the Third Adversary Proceeding</u>

The Court set the Complaint and responses for trial on November 29, 2011, and November

---

[20]Wingate, J. *Infinity Services of Miss., LLC and Ricky Myers vs. Liberty Mutual Co., et. al.,* Case No. 3:04-cv-392-HTW-LRA, *Order*, Docket No. 55, p. 7, March 21, 2005. (emphasis added).

30, 2011. The transcript of the trial was filed with the Court on January 26, 2012. After the initial *Order Regarding Post-Trial Briefs* (#62) was entered on February 1, 2012, the briefing schedule was extended at the request of the parties by agreed order six times. The final brief was filed on August 22, 2012, and the Court took the matter under advisement at that time.

## CONCLUSIONS OF LAW

### I.

This Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B) and (O).

### II.

Under § 1306, property of the estate in a Chapter 13 case includes the property specified in § 541 and any after-acquired property, that is, property acquired after the commencement of the Chapter 13 case. Upon conversion to a Chapter 7 case, the general rule is that "property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion." 11 U.S.C. § 348(f)(1)(A). Therefore, by definition, the general rule is that upon conversion from a Chapter 13 case, after-acquired property does not become property of the Chapter 7 estate.

However, there is an exception to the general rule. Pursuant to § 348(f)(2), if the debtor is found to have converted his/her case in bad faith, "the property of the estate in the converted case shall consist of the property of the estate as of the date of conversion." 11 U.S.C. § 348(f)(2). Liberty Mutual contends that the Debtors converted their case on March 2, 2001, in bad faith, and therefore, the District Court Action pursued by the Debtors and Infinity Services of Mississippi, LLC is property of the Debtors' bankruptcy estate. Of course, the Debtors contend otherwise.

14

This case has a convoluted and tortuous history, and the Court is poised to reach the ultimate issues of whether the Debtors converted their case in bad faith, and, if so, whether Infinity Services of Mississippi, LLC (and its claims against Liberty Mutual in the District Court Action) are property of the Debtors' bankruptcy estate. However, before addressing these issues, the Court must first determine if assets were claimed as exempt from the bankruptcy estate and, thus abandoned by the Trustee as alleged by the Debtors. If they were abandoned, then it is unnecessary for the Court to reach the issue of bad faith conversion.

**A. Were P&L and other assets claimed as exempt abandoned from the Debtors' estate?**

Pursuant to § 541, once a debtor files bankruptcy, all of the debtor's assets become property of the bankruptcy estate. The bankruptcy estate is then subject to the debtor's right under § 522(l) to exempt property, or in other words, reclaim some of the property from the bankruptcy estate. Section 522(b) specifies the types of property and maximum value of the exemptions a debtor may claim in certain assets, or alternatively, a debtor may exempt property under state law pursuant to § 522(b)(2). Unless a party in interest objects, the property a debtor claims as exempt will be exempt from the bankruptcy estate. 11 U.S.C. § 522(l).

In *Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S. Ct. 1644, 118 L.Ed.2d 280 (1992), the United States Supreme Court held that unless a trustee or party in interest objects to a debtor's claimed exemption within the time limit prescribed by Federal Rule of Bankruptcy Procedure 4003(b), the property is exempted from the bankruptcy estate–even if there is no good faith basis for the claimed exemption. *Taylor*, 503 U.S. at 643-44.

However, the Supreme Court clarified this holding in *Schwab v. Reilly,* — U.S. —, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010). In *Schwab*, the debtor valued an asset at $10,718 on Schedule B. The debtor then claimed the same amount, $10,718, as exempt on Schedule C. Neither the trustee

15

nor any other party in interest objected to the debtor's exemptions. At some point after the thirty-day objection period had run, the trustee discovered that the debtor had greatly undervalued the asset. The actual value of the asset was $17,200, which was far above the statutory exemption limit. The issue before the Supreme Court in *Schwab* was

> whether an interested party must object to a claimed exemption where, as here, the Code defines the property the debtor is authorized to exempt as an interest, the value of which may not exceed a certain dollar amount, in a particular type of asset, and the debtor's schedule of exempt property accurately describes the asset and declares the 'value of [the] claimed exemption' in that asset to be an amount within the limits that the Code prescribes.

*Schwab,* 130 S.Ct. at 2657.

The Supreme Court first addressed exactly what a debtor may exempt under § 522. The Supreme Court held that the exemption removes from the bankruptcy estate a debtor's "interest" in the property equal to a specified dollar amount, but the assets themselves are not removed from the bankruptcy estate. *Id.* at 2661-62.

The Supreme Court then distinguished *Taylor* from the factual situation in *Schwab* because unlike *Schwab,* the debtor's value claimed as exempt in *Taylor* was clearly outside the limits the Bankruptcy Code allows. The ruling in *Taylor* "establishes and applies the straightforward proposition that an interested party must object to a claimed exemption if the amount the debtor lists as the 'value claimed exempt' is not within statutory limits, a test the value ($ *unknown*) in *Taylor* failed, and the values ($8,868 and $1,850) in this case pass." *Id.* at 2666.

In *Schwab,* the Supreme Court held that the values of the claimed exemptions are facially within the limits set by the Bankruptcy Code, and therefore, "raise no warning flags that warranted an objection"[21] by the trustee.

---

[21]*Id.*

16

> For all of these reasons, we conclude that [the trustee] was entitled to evaluate the propriety of the claimed exemptions based on three, and only three, entries on Reilly's Schedule C: the description of the business equipment in which Reilly claimed the exempt interests; the Code provisions governing the claimed exemptions; and the amounts Reilly listed in the column titled "value of claimed exemption." In reaching this conclusion, we do not render the market value estimate on Reilly's Schedule C superfluous. We simply confine the estimate to its proper role: aiding the trustee in administering the estate by helping him identify assets that may have value beyond the dollar amount the debtor claims as exempt, or whose full value may not be available for exemption because a portion of the interest is, for example, encumbered by an unavoidable lien. See, *e.g.,* 3 W. Norton, Bankruptcy Law and Practice § 56:7 (3d ed.2009).

*Schwab*, 130 S. Ct. at 2663.

Applying the test established by the Supreme Court in *Schwab* to the case at bar, on September 1, 2000, the Debtors filed their *Summary of Schedules*, Case No. 00-53489EE,[22] ECF #2/NIBS #1A.[23]   *Schedule C-Property Claimed as Exempt* lists the following property in pertinent part:

| Description of Property | Specific Law Providing Each Exemption | Value of Claimed Exemption |
|---|---|---|
| Mass Marketing & Distribut. | MCA § 85-3-1(a) | 0.00 |
| P & L Properties, LLC | MCA § 85-3-1(a) | 0.00 |

*Summary of Schedules, Schedule C – Property Claimed as Exempt*, Case No. 00-53489EE, ECF #2/NIBS #1A, (Sept. 1, 2000).

---

[22]As noted previously, this case was originally assigned to Judge Edward R. Gaines and given case number 00-53489SEG.  When the case was assigned to Judge Ellington, the case number changed to 00-53489EE.  For purposes of this Opinion, case number 00-53489EE will be used.

[23]In March of 2005, this Court converted from paper filings to electronic filings under the Case Management/Electronic Case Filing System (CM/ECF).  Since this bankruptcy case was filed in 2000, it has a paper file in addition to an electronic file.  Prior to CM/ECF, the Court used a docketing system called NIBS. When NIBS dockets were converted to CM/ECF dockets, the numbering of some of the docket entries changed from what they were under NIBS.  Consequently, the number on the actual pleading in the paper file may be different from what is on the CM/ECF docket.  When this occurs, a CM/ECF and a NIBS docket number will be given.

As shown above, no entity named Infinity is listed in Schedule C.  However, the Debtors contend that because P&L was listed as exempt property in Schedule C and because no party in interest objected to their exemptions, even if they formed Infinity using assets of P&L, Infinity never became property of the bankruptcy estate because P&L was exempt.

No party has raised an objection to the specific code section the Debtors listed as governing the claimed exemption, and, therefore, that is not at issue.  Pursuant to *Schwab,* the Trustee is entitled to rely on the other two columns to determine whether he should object to the claimed exemptions: (1) the description of the property and (2) the value of the claimed exemption.  Since the amount claimed as exempt was 0.00 for both, and since a value of zero would clearly fall within the statutory limits, the Trustee was not required to object to the exemptions in order to preserve the estate's rights above the value of zero which was listed in the Debtors' *Schedule C*.  If the Debtors were seeking to exempt the entire asset, the Debtors were under a duty to state so clearly in order to put the Trustee on notice of their intention.  Placing a value of 0.00 on their claimed exemptions fails to do so.  "[W]hen a debtor retains only an interest in an asset, rather than the asset itself, the debtor is limited to the value of the exemption; the estate is entitled to any appreciation in the asset's value beyond the amount exempted."  *In re Orton,* 687 F.3d 612, 618-19 (3d Cir. 2012)(citations omitted); *see also Gebhart v. Gaughan (In re Gebhart),* 621 F.3d 1206, 1211 (9th Cir. 2010)("Under *Reilly,* an exemption claimed under a dollar-value exemption statute is limited to the valued claimed at filing.")

Since the Debtors' dollar-amount exemptions failed to raise a "red flag" that would have put the Trustee on notice to object, the Trustee need not have objected to the Debtors' exemptions in order to preserve the estate's rights to the value of the assets above the amount claimed as exempt.  Hence, the assets themselves and any amount above zero (the amount of Debtors' claimed

exemption) are property of the Debtors' bankruptcy estate.[24]

### B. Did the Debtors convert to a Chapter 7 Case in bad faith?

Having found that Mass Marketing Distributors and P&L have not been abandoned from the Debtors' bankruptcy estate, the Court must determine if the Debtors converted from a Chapter 13 case to a Chapter 7 case in bad faith.

Section 348 states in pertinent part:

### § 348.  Effect of Conversion

. . . .

**(f)(2)** If the debtor converts a case under Chapter 13 case of this title to a case under another chapter under this title in bad faith, the property of the estate in the converted case shall consist of the property of the estate as of the date of conversion.

11 U.S.C. § 348(f)(2).  Therefore, if the Court finds that the Debtors converted their Chapter 13 case to a Chapter 7 case in bad faith, any property the Debtors held on the date of conversion will be property of the Chapter 7 estate.

Bad faith is not defined in the Bankruptcy Code.  Within the jurisdiction of the Court of Appeals for the Fifth Circuit, one of the first bankruptcy courts to address the issue of bad faith as found in § 348(f)(2) is *Moser v. Mullican (In re Mullican),* 417 B.R. 389 (Bankr. E.D. Tex. 2008). In *Mullican,* the debtors filed a Chapter 13 case, and their plan was confirmed.  While their Chapter 13 case was pending, one of the debtors inherited his mother's home, two vehicles, funds in checking accounts (around $14,000), an IRA (around $162,000), and the cash value of a life insurance policy ($986.49).  Subsequently, the debtors converted to a Chapter 7 case.  At the § 341 Meeting of

---

[24]The Court will note that the when the Debtors filed amended schedules on March 31, 2005, the Debtors removed Mass Marketing Distributions and P & L Properties, LLC from the property they claimed as exempt on *Schedule C* (#76)*.*  This change does not affect the Court's holding that the assets were not abandoned from the bankruptcy estate.

Creditors, the debtors did disclose to the Chapter 7 trustee the inherited IRA and house, but did not disclose the other items, and the debtors falsely stated that they had only received $15,000 from the sale of the house (instead of the $20,000 they had actually received).  The Chapter 7 trustee asserted that all of the property the debtors inherited post-petition in their Chapter 13 case was property of the Chapter 7 estate because the debtors had converted to a Chapter 7 case in bad faith.

In reviewing the case law on bad faith conversions, the *Mullican* court found that courts that have addressed bad faith under § 348(f)(2) have defined bad faith by looking at the good faith requirement under § 1325(a)(3).[25]  The Court of Appeals for the Fifth Circuit has adopted the totality of the circumstances test for determining whether a Chapter 13 plan has been proposed in good faith and satisfies § 1325(a)(3).  *See, e.g., Public Finance Corp. v. Freeman,* 712 F.2d 219, 221 (5th Cir. 1983)("We are persuaded that the phrase 'proposed in good faith' must be viewed in light of the totality of the circumstances surrounding [confirmation] of a given Chapter 13 plan.").  Consequently, the *Mullican* court adopted a totality of the circumstances test for bad faith under § 348(f)(2).

> Bad faith, like good faith, must be determined based on the totality of the circumstances.  In determining whether a Chapter 13 case has been converted in bad faith, the Court considers whether the conversion was motivated by an inability to make required payments to the Chapter 13 trustee.  The Court also considers whether the debtors have been forthcoming regarding the existence of any post-petition change in circumstances that might affect their ability to make payments to their creditors and whether the conversion would create a windfall for the debtors (other than a decrease in liabilities) to which they would not have been entitled but for the existence of their pending Chapter 13 case.

*In re Mullican,* 417 B.R. at 402.

Applying this test to the facts, the *Mullican* court found that the debtors had converted to a

---

[25]Section 1325(a)(3) provides that a court shall confirm a plan if "the plan has been proposed in good faith and not by any means forbidden by law."

Chapter 7 case in a deliberate attempt to avoid paying their unsecured creditors. Therefore, the court found that the debtors had converted in bad faith and that the inherited items were property of the Chapter 7 estate.

Bankruptcy courts outside this jurisdiction have also considered what constitutes bad faith. In *In re Siegfried,*[26] the court first looked to the definition of bad faith in *Black's Law Dictionary:*

> The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term "bad faith" is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will. *Stath v. Williams,* Ind.App., [174 Ind.App. 369] 367 N.E.2d 1120, 1124. *Black's Law Dictionary* (6th ed. 1990).

*In re Siegfried,* 219 B.R. at 584.

The *Siegfried* court found that in determining whether bad faith exists, a court should look to the specific facts of the case to see if there is "fraud, deception, dishonesty, lack of disclosure of financial acts or an abuse of the provisions, purpose or spirit of the Bankruptcy Code. In other words, a court will have to determine if there has been an unfair manipulation of the bankruptcy system to the substantial detriment or disadvantage of creditors." *Id.* at 585; *see also In re Bejarano,* 302 B.R. 559, 562 (Bankr. N.D. Ohio 2003)("'[B]ad faith' means 'not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'" (citation omitted)).

In the case at bar, Liberty Mutual contends that the actions of the Debtors clearly show that "there has been an unfair manipulation of the bankruptcy system to the substantial detriment or

---

[26]*In re Siegfried,* 219 B.R. 581 (Bankr. D. Colo. 1998).

21

disadvantage of creditors." *In re Siegfried,* 219 B.R. at 585.  In order to determine whether "there

has been an unfair manipulation of the bankruptcy system," the Court must examine the facts

surrounding the Debtors' filing and conversion.

Of particular relevance to the bad-faith inquiry were the business activities of P&L and the

creation of Infinity Services of Mississippi, LLC.  A time-line of these events is as follows:

1. On March 26, 1999, the Debtors entered into an agreement to sell Mass Marketing Distribution (MMD) to T & D Marketing for $118,000.  Thirty-five thousand dollars was paid by T & D Marketing as a cash down payment.  The remaining balance of $83,000 was amortized over 5 years at 9% interest with monthly payments of $1722.94 being made to the Debtors.  LMFE Exhibit # 1, Transcript Vol. 1 at 171-174.[27]

2. As stated earlier, on August 17, 2000, the Debtors filed their petition for relief under Chapter 13 case of the Bankruptcy Code.  At the time they filed their petition, the Debtors were owed approximately $65,600 from the sale of MMD.  LMFE Exhibit # 30-1; Transcript Vol. 1 at 175-76.

3. In December of 2000, Meylan Enterprises Company, Inc. (Meylan) contacted Rick Myers regarding P&L supplying employees for work on the U.S.S. Cole (Cole) at Ingalls Shipyard in Pascagoula, Mississippi.  Transcript Vol. 1 at 182-184; Transcript Vol. 2 at 14-17.

4. On December 8, 2000, Rick Myers contacted Steve Lee at Fox Everett Underwriters, Ltd. (Fox Everett) about obtaining workers' compensation coverage through the U. S. Longshore & Harbor Workers' Compensation Act (USH&L) for the employees he would be supplying for the Cole job.  The policy was issued in the name of P&L. Transcript Vol. 2 at 15-19, and 114-117.

5. On December 13, 2000, a check in the amount of $3000 was written on P&L's account with SouthTrust Bank.  The check was issued to Fox Everett and was the payment for the USH&L insurance.  LMFE Exhibit # 4; Transcript Vol. 2 at 20-22 and 114-117.

6. On December 15, 2000, an application for workers' compensation was filed in order to get coverage for P&L under Mississippi's assigned risk pool.  LMFE Exhibit # 70-3-B; Transcript Vol. 2 at 18-19.

7. On December 16, 2000, the workers' compensation policy for P&L's employees was approved.  Liberty Mutual  was the servicing carrier.  Rick Myers admits that the employees were employees of P&L and were outside of his franchise with Express Personnel.  LMFE

---

[27]The official transcript is in two volumes.  It was filed on January 26, 2012.  It is docket entry number 61.

Exhibit # 70-3-C; Transcript Vol. 2 at 22.

8.  On December 16, 2000, P&L employees began work on the Cole.  Transcript Vol. 2 at 22.

9.  Beginning on December 20, 2000, P&L/Express Personnel began sending invoices to Meylan and Spectrum Environmental Services (Spectrum) for the employees it had supplied for the Cole job.  The first four invoices dated December 20, 2000, and December 27, 2000, were issued in accordance with P&L/Express Personnel's billing agreement with Express Services.  The invoices were sent out by Express Services.  On these invoices, the address for Rick Myers' Express Personnel company was the Oklahoma office.  Once the invoices were paid, Express Services would send Express Personnel a commission    LMFE Exhibit # 70-9-A, B, C and D; Transcript Vol. 1 at 21; 61-62; Transcript Vol. 2 at 13-14.

The January 4, 2001, invoice to Spectrum was from Express Personnel with a Biloxi, Mississippi address.  This invoice has a different appearance from the invoices issued by the Express Services.  Spectrum paid this invoice to P&L.  LMFE Exhibit # 70-9-E.

The February 22, 2001, invoice to Meylan was from Express Personnel via the Oklahoma office.  LMFE Exhibit # 70-9-F.

A series of confusing and what appear to be duplicate invoices were sent starting on March 2, 2001.[28]  These invoices were either issued by P&L, Infinity Services (Infinity) or Infinity Services of Mississippi, LLC[29] (Infinity LLC).  All invoices had an Ocean Springs, Mississippi, post office box listed for the return address.  Until April 12, 2001,[30] regardless of which entity sent the invoices, all checks for payment on these invoices were paid to the order of P&L.  LMFE Exhibit #s 70-9-G; H; I; J; K; L; M & N.

10.  On January 9, 2001, Rick Myers wrote a check for $1800 made payable to *cash* out of P&L's account.  The memo states that the check was a "loan to officer."  This check was one of several checks written post-petition from P&L's account and made payable to *cash* and with a memo that it was a "loan to officer" or "loan to owner."  These other checks along with the $1800 check total approximately $4600.[31]  LMFE Exhibit # 49.

11.  The Chapter 13 case Trustee, Donald Simmons, sent a letter to the Debtors' attorney on

---

[28]These invoices were dated: March 2, 2001; March 9, 2001; March 10, 2001; March 14, 2001; March 22, 2001; and March 27, 2001.

[29]As noted later, Infinity Services of Mississippi, LLC was not created until March 30, 2001.

[30]A check dated April 12, 2001, for $80 was the first check which had the name Infinity listed as a payee.  This particular check was made out to "Infinity Srvs Rick Myers." LMFE Exhibit # 70-9-M

[31]There were other checks made payable to *cash;* however, the memo lines on these other checks were blank.  These checks and any checks written out of the Infinity of Mississippi, LLC account are not included in this total.

January 17, 2001. In the letter, Mr. Simmons expresses his concerns about the feasibility of the case. In addition, he requested information about P&L–what type of business it was, how many employees it had, etc. LMFE Exhibit # 70-1-C.

12.    In a letter dated February 2, 2001, from Rick Myers to his attorney, Rick Myers replied to Mr. Simmons' January 17, 2001, letter. The letter states that the "plan is feasible because my wife now has a job that pays her $22,000 per year." The letter also explains some of the expenses the Chapter 13 Trustee was questioning and states that P&L had 5 employees and was in the business of providing professional staffing, temporary services and payroll services. At trial, Rick Myers testified that this letter was evidence of their intent to proceed with their Chapter 13 payment plan. It appears that the Chapter 13 case Trustee never received a copy of this letter. LMFE Exhibit # 32 at 256; Transcript Vol. 1 at 140-42; Transcript Vol. 2 at 60-62.

13.    On February 2, 2001, the Chapter 13 case Trustee filed a motion to dismiss the Debtors' case because the Debtors' expenses exceeded their income; their expenses were excessive and because they were two plan payments behind. ECF #23/NIBS #22.

On February 14, 2001, the Debtors filed a response to the motion to dismiss. In their response, the Debtors acknowledge that their expenses exceeded their income. However, the Debtors stated that "those figures have now changed, as the nature of the Debtors' business has changed, and consequentially there is additional capital in which to fund the business expenditures."[32] The Debtors further state that they would modify their Chapter 13 case plan as soon as they received the information from their accountant. ECF #26/NIBS #25.

14.    Shortly after the motion to dismiss was filed, but before they filed their response to the motion, the Debtors purchased two vehicles (an Infinity and a Taurus) on February 10, 2001. The total purchase price was $14,244.25. The vehicles were paid for with a check written from P&L's account. These vehicles were not disclosed on the Debtors' schedules nor was it disclosed to the Chapter 7 Trustee at the 341 Meeting of Creditors. LMFE Exhibit # 70-4-A; Transcript Vol. 2 at 33-35.

15.    On February 13, 2001, Rick Myers withdrew $3236.89 from P&L's account. He testified that this was start-up money for Infinity and that the money was used to purchase hard hats and gloves for the employees who were working on the Cole job. LMFE Exhibit # 70-2-D; Transcript Vol. 2 at 32.

16.    Beginning on February 23, 2001, the employees who were working on the Cole job were paid with checks drawn on P&L's account. The memo line of the February 23, 2001, check states that it covered work from November 15, 2000, to February 23, 2001. The employees were also paid on March 3, 2001; March 7, 2001; March 14, 2001; and March 23, 2001, with checks written on P&L's account. LMFE Exhibit # 70-8-A; B; C; D; & E.

---

[32]*Answer to Trustee's Motion to Dismiss* (ECF #26/NIBS #25), Case No. 00-53489EE, Feb. 14, 2001.

24

17.   On February 26, 2001, Rick Myers purchased a Suburban from Spectrum for $19,641.25.[33] The *Bill of Sale* was made out to "Infinity Services c/o Ricky Meyers" *(sic)*. Like the two vehicles purchased on February 10, 2001, this vehicle was not disclosed on the Debtors' schedules nor was it disclosed to the Chapter 7 Trustee at the § 341 Meeting of Creditors. LMFE Exhibit # 70-4-B & C; Transcript Vol. 2 at 33-35.

18.   Around February 26th or 27th, 2001, Rick Myers had email exchanges with Express Services regarding his franchise. At some point prior to these email exchanges, Express Services had sent Rick Myers a "Cease and Desist" letter. LMFE Exhibit # 70-6-C.

19.   An order was entered on February 28, 2001, on the motion to dismiss. The order states that the Debtors were to file amended schedules and an amended plan to reflect that their income was now sufficient to pay their expenses and their plan payment. If the amended schedules and plan were not filed by April 1, 2001, the case was subject to being dismissed. ECF #28/NIBS #27.

20.   Also on February 28, 2001, Tina H. Myers obtained a cashier's check for $1600 from Keesler Federal Credit Union (Keesler). On the same day, this check, minus $20, was deposited into the Myers' personal bank account at SouthTrust Bank. James L. Henley, Jr., the expert who testified on behalf of Liberty Mutual, testified that the Debtors' schedules did not list an account with Keesler. LMFE Exhibit # 70-5-A & B; Transcript Vol. 1 at 43-44.

21.   In late February or before March 2, 2001, Rick Myers and Express Services agree that he will sell his franchise back to Express Services for $20,000. On March 2, 2001, Rick Myers sent Express Services a list of the assets which were to remain in his Express Personnel office. LMFE Exhibit # 70-6-D, E, F & G.

22.   On March 1, 2001, the Debtors filed a motion to convert their Chapter 13 case to a Chapter 7 case. The motion does not cite a justification for the conversion. However, the order which was entered on March 2, 2001, states that the reason for the conversion was due to an "extreme change in the financial situation of the Debtors."[34]

23.   As stated previously, on March 2, 2001, invoices were sent by P&L and Infinity to various parties for work on the Cole. Rick Myers testified that these were P&L's clients, and therefore, any checks received from work on the Cole and deposited into Infinity's account should have been deposited into P&L's account. LMFE Exhibit # 70-9-A through N.

---

[33]While the *Bill of Sale* is dated February 26, 2001, the *Application for Certificate of Title* states that the Peoples Bank of Biloxi obtained a lien on the vehicle almost one year later on February 21, 2002. The record is not entirely clear, but it appears Rick Myers made payments to Spectrum until he was able to consummate some type of wraparound loan with Peoples Bank of Biloxi. Transcript Vol. 1 at 30-31; Transcript Vol. 2 at 33.

[34]*Order to Convert from a Chapter 13 case to a Chapter 7 case,* (ECF #34/NIBS #33), Case No. 00-53489EE, March 2, 2001.

Transcript Vol. 2 at 37.

24.     On or about March 5, 2001, Rick Myers opened a checking account at SouthTrust Bank in the name of "Infinity Services of MS, LLC." Since Infinity LLC had not yet been officially created, Rick Myers used his Social Security number as the *Tax I.D. Number* for Infinity on the application. LMFE Exhibit # 70-7-A; Transcript Vol. 2 at 38.

25.     Also on March 5, 2001, Rick Myers wrote a check on P&L's account for $50 to the Mississippi Secretary of State. The memo line states that the check is for the "Formation Fee for Infinity." Mr. Henley testified that while the check states that it was returned for insufficient funds, the check eventually cleared P&L's account late March of 2001. LMFE Exhibit # 70-7-B; Transcript Vol. 1 at 55-56.

26.     On March 7, 2001, Rick Myers signed an "Application for Employer Identification Number" in order to obtain a federal tax identification number. On line 10 of the form, it states that the business started on March 1, 2001. Line 12 asks when the first wages were paid or will be paid. The date appears to have been changed from March 1, 2001, to March 15, 2001. LMFE Exhibit # 70-7-C.

27.     Beginning on March 12, 2001, checks were written to "Cash" out of the P&L account. The March 12, 2001, check was for $500. A check for $5000 was posted on P&L's account on March 15, 2001. On March 26, 2001, a check in the amount of $1000 was written on P&L's account with the memo stating "Transfer to Infinity Services Account." The next day, a deposit was made into Infinity's account for $1000. Finally, on March 30, 2001, a debit in the amount of $5000 was taken from P&L's account and deposited into Infinity's account. Rick Myers testified that the money generated by P&L was the only money he had to start up Infinity. LMFE Exhibit # 70-10-A, B, C & D. Transcript Vol. 2 at 76-79.

28.     On March 14, 2001, Express Services wired the $20,000 for the sale of the franchise to P&L's account. LMFE Exhibit # 70-6-H.

29.     On March 16, 2001, the *Agreement of Purchase and Sale* of the Express Services franchise was signed. LMFE Exhibit # 70-6-G.

30.     A check made payable to P&L in the amount of $20,343.98 was deposited into P&L's account on March 19, 2001. This payment covered invoices sent to Meylan from both P&L and Infinity. In the month of March 2001, Rick Myers received $39,918.46 from Meylan and Hiller Systems. LMFE Exhibit # 25 and # 70-9-G. Transcript Vol. 2 at 40-43.

31.     On March 30, 2001, Infinity LLC was officially created with the Mississippi Secretary of State. Also on March 30, 2001, employees were paid with Infinity LLC checks for the first time. LMFE Exhibit # 70-7-D & 70-8-F. Transcript Vol. 1 at 75-76.

32.    On April 10, 2001, the 341 Meeting of Creditors in the Debtors' Chapter 7 case was held.[35] At the meeting, the Debtors did not disclose to the Chapter 7 case Trustee that they had already received $20,000 for the Express Services franchise.  At trial, Rick Myers testified that he used that $20,000 as seed money for Infinity.  Transcript Vol. 1 at 148, 159, 187-88; Transcript Vol. 2 at 44, 53-55, 78-79.

33.    On April 24, 2001, the *Trustee's Report of No Distribution* was filed by the Chapter 7 case Trustee.  The Chapter 7 case Trustee certified that there were insufficient assets available to pay  creditors a dividend.  ECF #41/NIBS #40.

34.    On April 19, 2001, Infinity LLC filed its *Employer's Quarterly Federal Tax Return* for the quarter ending March 31, 2001.  Even though Infinity LLC was not formed until March 30, 2001, it states that Infinity LLC paid  a total of $31,733.75 in wages for the first quarter of 2001.  LMFE Exhibit # 70-12-A; Transcript Vol. 1 at 80-82.

35.    On April 27, 2001, Infinity LLC filed a *Status Report* with the Mississippi Employment Security Commission.  Question 6 of the report states that beginning date of employment in Mississippi began on March 1, 2001.  The box in Question 11 states that Infinity LLC paid $31,733.75 in wages for the first quarter of 2001.  LMFE Exhibit # 70-12-A; Transcript Vol. 1 at 82-83.

36.    A form numbered *ERM-14* styled *Confidential Request for Information* and dated September 5, 2001, was faxed to Fox Everett.  There is an X on the line next to "Name change only."  It further states that the date of ownership change was February 1, 2001.  Steve Lee testified that Rick Myers contacted him and inquired how to change the name on his workers' compensation policy.  Mr. Lee testified that he told Rick Myers that completing form ERM-14 was the way to accomplish a name change.  While Rick Myers testified that the signature on the form did not belong to him,[36] he did testify that P&L's workers' compensation policy was transferred to Infinity LLC.  LMFE Exhibit # 70-13; Transcript Vol. 2 at 44-46 and 117-123.

37.    The Debtors received their *Discharge of Debtor* and their case was closed on October 25, 2001.  ECF #57 & 58/NIBS 56 & 57.

38.    Almost three years later, on September 23, 2004, the Debtors filed their *Motion to Re-Open Bankruptcy Case.*  In their motion, the Debtors state that they wished to reopen their bankruptcy because in the District Court Action, Liberty Mutual alleged that the lawsuit was property of the Debtors' bankruptcy estate.  ECF #61/NIBS #60.

---

[35]See the meeting notice:  ECF #35/NIBS #34.

[36]The Court will note that in their *Defendant Rick and Tina Myers DBA Express Personnel DBA P & L Properties Answer and Affirmative Defenses to Cross-Claim of Liberty Mutual Insurance Company, Fox Everett Underwriters, LTD and Steve Lee,* Adversary No. 10-05014EE, Docket # 52, p. 4, ¶ 35, Nov. 23, 2011, it states that: "Defendants admit the form was signed by Rick Myers."

39.  On October 1, 2004, an order was entered reopening the Debtors' bankruptcy case.  ECF #62/NIBS # 61.

Applying the Fifth Circuit's totality of the circumstances test to the facts, the Court considers first, whether the conversion was motivated by the Debtors' inability to make Chapter 13 plan payments, and second, whether the Debtors have been forthcoming about the existence of post-petition changes.  The Court also considers the Debtors' motives.

### 1.  Was the conversion motivated by an inability to make Chapter 13 plan payments?

The Debtors failed to disclose the monthly payments of $1722.94 they were receiving from the sale of MMD.  Prior to the time the Chapter 13 Trustee filed the motion to dismiss, Rick Myers withdrew approximately $5700 in cash and paid an additional $3000 for an insurance premium out of P&L's account.

After the motion to dismiss was filed, the Debtors wrote a check out of P&L's account for $14,244.25 in order to purchase two vehicles.  These two vehicles were never disclosed to the Chapter 7 Trustee.  Before they converted their case, the Debtors bought a third vehicle.  This vehicle was also never disclosed to the Chapter 7 Trustee.

The day before they filed their response to the motion to dismiss, Rick Myers withdrew an additional $3236.89 from P&L's account in order to buy equipment for the employees he had working on the Cole job.  In their response, the Debtors acknowledged what is evident: that because of the work on the Cole job, the "nature of the Debtors' business has changed, and consequentially there is additional capital."[37]

On February 28, 2001, the Court entered an order on the motion to dismiss in which the Debtors were ordered to amend their schedules and their plan to show that their Chapter 13 case was

---

[37]*Answer to Trustee's Motion to Dismiss* (ECF #26/NIBS #25), Case No. 00-53489EE, Feb. 14, 2001.

28

feasible.  On that same day, Tina Myers withdrew $1600 from an account at Keesler.  This account was not disclosed on the Debtors' schedules.

While Rick Myers was in negotiations to sell his franchise back to Express Services, the Debtors filed a motion to convert to a Chapter 7 case due to an "extreme change in the financial situation of the Debtors."[38]  The Court does believe that statement to be true insofar as it denotes an extreme change, except that the extreme change was a positive one and not a negative one:  the Cole job was generating revenue for P&L and the Debtors knew that they were going to receive money for the sale of their Express Services franchise.  Indeed, on the day the order was signed converting their Chapter 13 case to a Chapter 7 case, Rick Myers sent Express Services a list of assets which were to remain in the Express Personnel office.  At the time of their Chapter 7 § 341 Meeting of Creditors, the Debtors had already received $20,000 from Express Services, but they did not disclose this fact to the Chapter 7 Trustee.

The Court finds that the record is clear that "the conversion was [not] motivated by an inability to make required payments to the Chapter 13 case trustee."[39]  At the trial, Rick Myers testified that when he stated in his February 2, 2001, letter to the Trustee that it was his intent to pay "each and every creditor that is owed, both personally and professionally," he was speaking truthfully.[40]

Twelve days later, in their response to the motion to dismiss, the Debtors state that there had been a change in their circumstances which would allow them to make their plan payments.  The Court finds that the record supports the Debtors' statement.  The Debtors' business was generating

---

[38]*Order to Convert from a Chapter 13 case to a Chapter 7 case,* (ECF #34/NIBS #33), Case No. 00-53489EE, March 2, 2001.

[39]*In re Mullican*, 417 B.R. at 402.

[40]LMFE Exhibit # 32 at 256; Transcript Vol. 1 at 140-42; Transcript Vol. 2 at 60-62.

29

capital and Tina Myers had obtained separate employment and was earning $22,000 a year. Additionally, the Chapter 13 Trustee asserted that the Debtors had more income available to pay their creditors because the Debtors' expenses exceeded the Court's guidelines and the Debtors' had listed an expense for insurance twice.[41]  The Court will also note that when reviewing the Debtors' *Schedule J Current Expenditures of Individual Debtor(s)* and *Business Income and Expenses*, the Court discovered that there appear to be mathematical errors which inflated the Debtors' expenses.[42]

Consequently, the Court finds that the Debtors' were absolutely correct when they stated in their response to the motion to dismiss that there had been a change in their circumstances which enabled them to fund their Chapter 13 plan payments.  For that reason, the Court finds that the Debtors did not convert to a Chapter 7 case because of the Debtors' inability to fund their Chapter 13 plan.

### 2.  Have the Debtors been forthcoming?

The Debtors did not disclose the existence of the Keesler account; the three vehicles acquired post-petition; the monthly payments they were receiving from the sale of MMD; and the $20,000 they received from the sale of their Express Services franchise.  While the Debtors have now given the Chapter 7 Trustee $20,000, they only did so after the Trustee filed an adversary proceeding to recover the money.

In their brief, the Debtors' rely upon the previously cited case of *In re Bejarano* to support their position that the Debtors did not convert their case in bad faith.  In *Bejarano*, the debtors filed a Chapter 13 case, and ten months later, they filed a motion to convert their case to a Chapter 7 case.

---

[41]*See Trustee's Motion to Dismiss*, (ECF #23/NIBS #22), Case No. 00-53489EE, Feb. 2, 2001).

[42]When adding up the expenses listed on the *Business Income and Expenses* schedule, the total comes to $13,041 and not the $14,441 as listed.  LMFE Exhibit # 30-12 and # 30-13.

While their Chapter 13 case was pending, the debtors and their children were involved in an automobile accident, however, the debtors did not pursue a claim against the other party involved in the accident.  While the debtors were employed at the commencement of their Chapter 13 case, both debtors became unemployed during the pendency of the case.  The debtors only made one payment to the trustee.  The debtors also became entitled to a tax refund for the year 2002.

In June of 2002, the trustee filed a motion to dismiss their case.  The debtors filed a motion to convert to a Chapter 7 case before the September 2002 hearing on the motion to dismiss.  Subsequently, the Chapter 7 trustee alleged that the debtors had converted in bad faith, and therefore, the tax refund and the personal injury claims were property of the Chapter 7 estate.

The *Bejarano* court adopted the test used in the *Siegfried* case, and found that the debtors had not converted in bad faith.  The court held: "As it pertains to this position, however, it must be initially noted that from a legal perspective, no inference of 'bad faith' arises solely because a debtor acquires a postpetition, but preconversion assets *[sic]*, and thereafter elects to convert their case on account of the protection afforded by § 348(f)(1)."  *In re Bejarano*, 559 B.R. at 562 (citations omitted).  In denying the trustee's motion, the court found that the debtors had not unfairly manipulated the bankruptcy system nor was there any nefarious planning involved on the part of the debtors.

*Bejarano* is clearly distinguishable from the case at bar.  In the case at bar, the Debtors failed to disclose not only pre-petition assets, but they also failed to disclose post-petition/pre-conversion assets.  Also unlike the debtors in *Bejarano* who became unemployed during their Chapter 13 case, Tina Myers obtained employment and P&L obtained work on the Cole during the pending Chapter 13 case.

The Court finds that the record is clear that the Debtors were not forthcoming about the

existence of changes in their post-petition circumstances and that the conversion created a windfall for the Debtors to the detriment of their creditors.

### 3.  Was the Debtors' motive sinister?

The Court finds that while the record may not show that the Debtors' actions constitute actual or constructive fraud, it does clearly show "'a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.'"[43] Nor does the Court find that the Debtors' actions were the result of bad judgment or negligence.  Rather, the record proves that the Debtors were "affirmatively operating with furtive design or ill will."[44]

Having found that the conversion was not motivated by an inability to make Chapter 13 plan payments, that the Debtors have not been forthcoming, and that the Debtors acted with an interested or sinister motive, the Court finds that the Debtors' converted their Chapter 13 case to a Chapter 7 case in bad faith.  Therefore, the property of the Chapter 7 estate includes property held by the Debtors as of March 2, 2001, the date they converted to a Chapter 7 case.

The Court now turns to the issue of whether Infinity LLC is property of the bankruptcy estate. The Debtors allege that Infinity LLC was a totally separate entity created after they converted to a Chapter 7 case, whereas Liberty Mutual alleges that Infinity is a successor in interest to P&L, and therefore, it is property of the bankruptcy estate.

### C.  Is Infinity Services of Mississippi, LLC property of the Chapter 7 estate?

Section 541(a) details what property comprises the bankruptcy estate once a petition is filed. With a few exceptions, the property of the estate includes all legal or equitable interests held in

---

[43]*In re Siegfried,* 219 B.R. at 584 (citations omitted).

[44]  *Id.*

property by the debtor as of the commencement of the case.  Of particular relevance here, § 546(a)(6)

provides that property of the estate includes: "(6) [p]roceeds, product, offspring, rents, or profits of

or from property of the estate, except such as are earnings from services performed by an individual

debtor after the commencement of the case." 11 U.S.C. § 541(a)(6).

The Fifth Circuit addressed § 541(a)(6) in *McLain v. Newhouse (In re McLain),* 516 F.3d 301

(5th Cir. 2008).[45]    In *McLain,* the Fifth Circuit held:

> "This generous provision [§ 541(a)(6)] sweeps into the bankruptcy estate all interests
> held by the debtor—even future, non-possessory, contingent, speculative, and
> derivative interests." *In re Dibiase,* 270 B.R. 673, 676 (Bankr.W.D.Tex.2001).
> Congress intended this provision to be quite broad, not limited to the definition of
> "proceeds" set forth in the Uniform Commercial Code, "but encompassing any
> conversion in the form of property of the estate, and anything of value generated by
> property of the estate." *In re Hanley,* 305 B.R. 84, 86–87 (Bankr.M.D.Fla.2003)
> (quoting S.Rep. No. 95–989, at 82 (1978); H.R.Rep. No. 95–595, at 368 (1977), *as
> reprinted in* 1978 U.S.C.C.A.N. 5787). The bankruptcy estate also includes "[a]ny
> interest in property that the estate acquires after the commencement of the case." 11
> U.S.C. § 541(a)(7). "Congress enacted § 541(a)(7) to clarify its intention that § 541
> be an 'all-embracing definition and to ensure that property interests created with or
> by property of the estate are themselves property of the estate.' " *In re Hanley,* 305
> B.R. at 87 (quoting 124 Cong. Rec. H11096 (daily ed. Sept. 28, 1978) (statements
> of Rep. Edwards); 124 Cong. Rec. S17413 (daily ed. Oct. 6, 1978) (statements of
> Sen. DeConcini)). **Thus, by virtue of these two provisions, if undisclosed pre-
> petition funds,** *i.e.,* **property of the bankruptcy estate, were used to generate
> some type of property interest, that subsequent property interest is part of the
> bankruptcy estate and reachable by [the debtor's] creditors**.

*In re McLain*, 516 F.3d at 312 (emphasis added).

Since this Court has found that the Debtors converted their Chapter 13 case in bad faith, the

Chapter 7 estate includes all legal and equitable interests in property held by the Debtors and

---

[45]The issue before the Fifth Circuit in *McLain* was "whether the use of undisclosed, pre-petition
bankruptcy funds to make the first premium payment on a term life insurance policy renders all or
some of the policy proceeds part of the bankruptcy estate." *In re McLain,* 516 F.3d at 305.

includes all "[p]roceeds, product, offspring, rents, or profits of or from property of the estate"[46] as of March 2, 2001.

The Court agrees with Rick Myers that Infinity LLC was not formally created until March 30, 2001, however, the Court finds that the date of formation is not dispositive because the record clearly shows that Rick Myers began doing business as Infinity (through P&L) long before Infinity LLC was formally created.

As listed in detail above, Rick Myers testified that the two vehicles he bought on February 10, 2001, with money from P&L's account were for use in Infinity's business and his personal use.[47] In addition, on February 13, 2001, Rick Myers withdrew $3236.89 from P&L's account in order to buy equipment for employees who were working on the Cole job. He testified that money was part of the start-up money for Infinity.[48] Therefore, at least by February 10, 2001, Rick Myers was using proceeds or profits and/or assets of P&L, which were clearly part of the Chapter 13 estate, in order to startup Infinity.

Rick Myers acknowledged that he received payments from Hiller and Meylan for work done by P&L's employees in the months of February and March of 2001. However, he deposited those funds into the account he opened around March 5, 2001, for the yet to be created Infinity LLC.[49]

After examining Infinity LLC's IRS Form 941,[50] an employer's quarterly federal tax return, which Infinity LLC filed on April 19, 2001, Liberty Mutual's expert, James L. Henley, Jr., testified

---

[46]11 U.S.C. § 541(a)(6).

[47]Transcript Vol. 2 at 33.

[48]LMFE Exhibit # 70-2-2; Transcript Vol. 2 at 32.

[49]Transcript Vol. 2 at 37-40.

[50]LMFE Exhibit # 70-12-A.

the return showed that Infinity LLC included wages paid by P&L during the quarter–the list of employees attached to the IRS Form 941 were the same employees who were paid by P&L. Mr. Henley stated that the form was proof that

> it's the same company, and that's why [Infinity LLC] is reporting the wages for the whole quarter. Traditionally, what you would do if it was a real separate entity, you would have filed a separate return closing out the prior entity and then simply filed a return for the new entity for just that portion of the wages that were paid. In this case, it's a cumulative payment.

Transcript Vol. 1 at 81.

While more examples of where assets, proceeds or profits from P&L were used to create Infinity LLC are previously listed in this opinion, the final example is the $20,000 the Debtors received on March 14, 2001, from the sale of their Express Services franchise. Rick Myers testified that he used those funds as seed money for Infinity.[51]

Consequently, the Court finds that the Debtors used property of the bankruptcy estate to start up and create Infinity LLC, and therefore, Rick Myers' interest in Infinity Services of Mississippi, LLC, is property of the Debtors' Chapter 7 estate.[52]

## CONCLUSION

The Debtors allege that P&L was abandoned from the Bankruptcy estate because no party objected to the Debtors' claimed exemption in P&L. However, since the Debtors dollar amount exemption was zero, the asset itself and any amount above the value of zero the Debtors claimed as

---

[51]Transcript Vol. 2 at 44.

[52]In his deposition, Rick Myers stated that he was the only member of Infinity LLC. LMFE Exhibit 56 at 142 (actual transcript page 559). Since there are no other members of Infinity LLC, there is no question that the Trustee obtained all of Rick Myers' rights in Infinity LLC. *In re Albright,* 291 B.R. 538, 540 (Bankr. D. Colo. 2003) ("Because there are no other members in the LLC, . . . the Debtor's bankruptcy filing effectively assigned her entire membership interest in the LLC to the bankruptcy estate, and the Trustee obtained all her rights. . . .")

exempt are property of the Debtors' bankruptcy estate pursuant to the Supreme Court case of *Schwab v. Reilly,* — U.S. —, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010).

When faced with a determination of whether a debtor has converted from a Chapter 13 case to a Chapter 7 case in bad faith pursuant to § 348(f)(2), "a court should look at the specific facts of the case to determine if there is fraud, deception, dishonesty, lack of disclosure of financial acts or an abuse of the provisions or spirit of the law." *In re Siegfried,* 219 B.R. at 587.

In the case at bar, the cumulative effect of the Debtors' (1) failure to disclose the monthly payments of $1722.94 they received from the sale of MMD; (2) failure to disclose the three vehicles bought by the Debtors; (3) failure to disclose the account at Keesler Federal Credit Union; (4) failure to disclose the $20,000 the Debtors received for the sale of the Express Personnel franchise; (5) failure to deal with the Court and the Chapter 7 case Trustees in a fully candid and truthful manner; and (6) use of estate assets or proceeds and/or profits from estate assets in order to create a new entity, namely Infinity LLC, have led the Court to find that the Debtors' actions show that "there has been an unfair manipulation of the bankruptcy system to the substantial detriment or disadvantage of creditors,"[53] and therefore, the Debtors converted from a Chapter 13 case to a Chapter 7 case in bad faith.

Since the Court has found that the Debtors converted in bad faith, the Debtors' Chapter 7 estate includes all property held by the Debtors at the date of the conversion. The Debtors used proceeds, products or profits from and of P&L in order to create and then run another entity, Infinity LLC. Consequently, this "subsequent property interest is part of the bankruptcy estate." *In re McLain,* 516 F.3d at 312.

In his March 21, 2005, *Order,* Judge Wingate clearly held that the causes of action which are

---

[53]*Id.* at 585.

the subject of the District Court Action accrued prior to the time the Myers converted their Chapter 13 case to a Chapter 7 case.  Judge Wingate further held that if the conversion is found to have been in bad faith, the causes of action would be property of the bankruptcy estate.  This Court has found that the Debtors' conversion was in bad faith, and, consequently, the causes of action in the District Court Action are property of the Chapter 7 estate.

A separate judgment consistent with this opinion will be entered in accordance with Rules 7054 and 9021 of the Federal Rules of Bankruptcy Procedure.

Edward Ellington
United States Bankruptcy Judge
Dated: February 14, 2013

37